Remus HALL

v.

The AMERICAN OIL COMPANY,
a body corporate.

No. 3965.

United States District Court
D. Maryland.

April 8, 1958.

Moses Davis, Baltimore, Md., for libellant.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (Mr. Randall C. Coleman Jr.), Baltimore, Md., for respondent.

R. DORSEY WATKINS, District Judge.

In the first count of his amended libel the libellant claims $150,000 damages for permanent disability caused by the unseaworthiness of respondent's ship, the Amoco Virginia, and for maintenance and cure for injuries sustained in the course of his duty while in the service of the ship. The second count claims $50,000

for "additional pain and suffering" caused by the negligence of respondent in negligently failing to furnish libellant with competent medical and hospital services and attention.

Respondent denied the claims of unseaworthiness and negligent treatment and care; and denied sufficient knowledge of the facts associated with the occurrence of plaintiff's alleged injury on the ship to plead to such allegations. Many of the facts are undisputed or uncontroverted. On the entire evidence, the court makes the following findings of facts and conclusions of law:

### Findings of Fact.

Libellant, then 42 years of age, signed on the respondent's Amoco Virginia at Baltimore, Maryland, on December 27, 1956, as "Bedroom Utility", for a voyage which ended at Jacksonville, Florida, on January 14, 1957. His work was to change the linen in, and generally tidy-up, the officers' quarters.

Before breakfast (which was at 8 a. m.) on January 14, 1957, libellant undertook a routine clean-up of the Chief Engineer's room. This had on the floor two scatter rugs less than one year old, each approximately two feet by four and one-half feet, with ridged backs and triangular rubber pads under each corner. The cabin deck was of asphalt tile, similar to that in use in passenger cabins of luxury liners and the wax on it was similar to that used in such passengers' cabins. The floor had been waxed, not more recently than three weeks, with Johnson's Brown Label wax, designed for use on asphalt tile under commercial conditions, which met the Underwriter's Laboratory

"slip" test. Similar rugs were placed on similar floors in the other officers' quarters. The rugs were not permanently fastened, and were intended to be, and were, taken out on deck from time to time and shaken overboard for cleaning.

At a time which libellant fixes at between 7:00 and 7:30 a. m., and which time the court finds to be approximately correct, libellant had made the Chief Engineer's bed and turned toward the dresser to get a blanket. This required him to step on one of the rugs. It slid, and he "hit the deck", "felt something in his back"; after a "second or two" he raised up, then got up and completed his work in the room.

At the time of the fall, the rug was "stretched out flat as it ought to be"; it was necessary for libellant to step on it to do his work. He had done so every day, both in this room and in the other officers' rooms. The particular acts libellant was doing at the time involved "nothing unusual."

During the trip to Jacksonville some rough weather was encountered, but at the time of libellant's fall the vessel was at anchor in Jacksonville harbor, with engines idle.[1]

Libellant reported his fall to the Chief Steward after breakfast, but neither attached any significance to it. In the afternoon, libellant complained to the Chief Steward that his back hurt him, and was told to go to the Captain for a hospital slip.[2] No slip was obtained by libellant before he signed off late that afternoon.

Libellant arrived home in Baltimore the next day. The soreness in his back

[1]. The court accepts this evidence from the ship's log and the testimony of the Chief Officer, over that of libellant that the ship was in motion through noticeable swells.

[2]. The court accepts the testimony of the Chief Steward and Chief Officer that regular procedure, followed in this case, required libellant to report to the Captain for a hospital slip, over the testimony of libellant that he was sent to the Chief Officer, and tried to see him

on two occasions but was denied access because the Chief Officer was otherwise engaged. As libellant did not at the time have sufficient service to enter a United States Public Health Hospital without a letter from respondent, and in view of the apparent failure of such Hospital in Baltimore, Maryland, where he was subsequently admitted, correctly to diagnose his trouble, the conflict is significant only on the general question of credibility.

increased, and by January 21 he could scarcely get out of his chair. He went to the Marine Hospital, but was denied admittance, as a non-emergency case, because he had no hospital slip. Later libellant employed an attorney and proper authorization having been obtained from respondent, libellant entered the Marine Hospital on March 7, 1957. The admittance history showed a complaint of the original injury; a subsidence of acute symptoms with a second episode two weeks before admission, lasting three days; and a third episode about one week before admission. A thorough physical examination was given, and X-rays were taken. There was a notation that a herniated disc should be ruled out. Further examinations were made on April 5, April 22 and May 24, 1957, at which libellant's condition was found to be practically unchanged, and he was noted as unfit for duty. On June 7, 1957, he was found to be "somewhat better", but still with many complaints, and still unfit for duty. On July 8, 1957, the doctors at Marine Hospital found libellant's "condition subjectively unchanged", but that his unfitness was predominantly of a neuro-psychiatric nature. He was discharged as not fit for duty for one month, but with no return appointment.

On August 13, 1957, libellant was seen at Sinai Hospital by Dr. Clinton R. Harrison, an orthopedic surgeon. His examination and libellant's past medical history[3] made him suspicious of a herniated disc. A myelogram on August 21 showed an indentation strengthening this suspicion. On August 23 an operation was performed for the removal of the entire disc between the fourth and fifth lumbar vertebrae. At the same time the space between the fifth lumbar and first sacral vertebrae was explored, and a calcified area found, indicating a previous operation in that area. The post-operative history was uneventful, and libellant was again seen by Dr. Harrison on January 28, 1958. Libellant at that time complained of a little back pain, but stated that otherwise he was well. The examination showed no loss of sensation and no muscular weakness. In Dr. Harrison's opinion, libellant had reached his maximum improvement. While libellant was advised against heavy manual work, in Dr. Harrison's opinion he could return to light work, such as bending, lifting up to twenty pounds, making beds, and going up and down stairs carrying trays up to twenty pounds.[4]

Dr. Harrison estimated permanent total disability at $33\frac{1}{3}\%$, of which he would ascribe 10% to the previous disc operation, "even sympton-free as he was" before the January 14, 1957 incident, on the basis of such statements by libellant to him. If libellant had had constant complaints following the earlier disc operation, the disability attributable to it would be in excess of 10%.

Respondent asks the court to rule that the Amoco Virginia was not unseaworthy,[5] and to conclude that the incident of January 14, 1957, if it occurred, did not change the condition of libellant from what it was when he joined the ship; and that libellant's failure to reveal his true physical condition at his pre-sign-on physical examination relieves it of any obligation to pay for maintenance and cure.

Libellant discloses an unfortunate accident-prone and claim-prone tendency. In 1950, while lifting an object, he twisted himself, sustaining a severe low back

---

3. Discussed below.

4. The permitted work would have enabled libellant to return to duty as a "Bedroom Utility".

The court's trial notes when libellant took the stand, before any medical testimony had been offered, are as follows:

"Walks slowly, but without noticeable limp. Gets into chair slowly but easily; face unlined; no apparent pain. Moves arms freely, in descriptions. Not restless. Rises to show point of impact. Gets down carefully but easily."

5. Libellant claimed unseaworthiness, and not negligence, although at the beginning of the trial and before any testimony was taken, the court suggested the possibility that negligence with respect to the rugs might be an issue.

pain. X-rays disclosed a slight narrowing between the fifth lumbar and first sacral vertebrae. On August 25, 1950, a herniotomy at this space was performed, the central disc in this area being found densely adherent and hard to remove. The fourth intervertebral space was examined and found to be normal. In March 1951 he reshipped and from then until September, 1953, he worked on various vessels, experiencing spells of muscle spasm two or three times a year.

After various shore jobs, libellant on February 7, 1956, signed on the Fairland as Messman, serving until May 5, 1956. On that date he stopped work because of pain in his right hip and leg which he attributed to the lifting of a sack of sugar two weeks previously. The admission report of Marine Hospital shows complaints of such pains, but none in the back. A questionable disc was ruled out, and the case was diagnosed as muscular inflammation in the region of the right buttock. On June 11, 1956, libellant reported that his hip was better, and asked for a final medical discharge, "which was gladly tendered."

In signing on the Fairland, libellant had executed a waiver of any claim "in connection with, due to, or resulting from" defective vision and spinal operation of 1950, "or any aggravation or extension of said condition."

In his examination before signing on the Amoco Virginia, libellant disclosed the disc operation in 1950, but denied any injuries to the skull, back or extremities.

On February 5, 1957, libellant was examined for respondent by Dr. John C. H. Johnson, an orthopedic specialist. The history given by libellant was consistent with that heretofore summarized. The various physical tests and X-rays gave Dr. Johnson the impression of an aggravation of an old degenerative process in the fifth lumbar-first sacral area, which was clearing, libellant then having relatively little difficulty. Dr. Johnson expected libellant to be able to return to work in a few weeks. He thought all the symptoms could be explained on the basis of the old injury and operation.[6]

On the stand, libellant denied any unusual incident or occurrence between his fall on January 14, 1957, and his operation on August 23, 1957.

In addition to the above facts, respondent points to certain inconsistencies in libellant's answers to interrogatories; to the fact that libellant admitted making claims against eight of the nine ships on which he had served, and was not sure whether or not he had made claim against the ninth; and that libellant in the course of his work on the Amoco Virginia, and under less favorable conditions, had had occasion many times to step on this very rug and similar rugs without incident; and that the ship's officers had daily, and under all sorts of weather conditions, stepped on similar rugs without ever slipping.

### Discussion.

Counsel have been unable to refer the court to any case in which a vessel has been held to be unseaworthy because of the use of rugs not firmly secured to the decks. Even in the case of passengers, the ship is under no obligation to secure furniture which is inherently safe, but only to warn passengers of dangers which they are not likely to anticipate because of their inexperience at sea, particularly in heavy weather. Compagnie Generale Transatlantique v. Bump, 2 Cir., 1916, 234 F. 52, 54, certiorari denied 1916, 242 U.S. 642, 37 S.Ct. 114, 61 L.Ed. 542; Gerrish v. Panama Canal Co., 7 Misc.2d 719, 166 N.Y.S.2d 258, 1957 A.M.C. 2104, 2105; The Winnipeg, D.C.D.Cal.1933, 5 F.Supp. 469, 1933 A.M.C. 1528; Whelan v. The Harrisville Co., C. C. Duval County, Fla., 1950 A.M.C. 833; Preston v.

---

6. Dr. Johnson did not see libellant again until March 11, 1958. His opinion was that libellant had a permanent partial disability of 30%, of which he would attribute one-half to the 1950 operation, and one-half to the 1957 operation. While libellant should not do heavy work, Dr. Johnson stated specifically that libellant "could do work compatible with a Bedroom Utility Steward."

Hudson River Day Line, 1941, 176 Misc. 412, 27 N.Y.S.2d 597, 1941 A.M.C. 453.

 The court finds no evidence of unseaworthiness in the use, under the facts of this case, of unsecured rugs on a deck with wax at least three weeks old —the only basis for the claim of unseaworthiness.

 Likewise, the court finds nothing in the evidence to support the second count for negligence of the respondent in failing to furnish libellant with competent medical and hospital services and attention. Libellant was examined by Dr. Johnson, a recognized orthopedic specialist, and reliance upon his opinion, and that of the staff of Marine Hospital, could not be classed as negligence on the part of respondent.[7]

 Drs. Harrison and Johnson, and the orthopedic specialist from Marine Hospital, all expressed the opinion that the fall to which libellant testified could have caused the ruptured disc which was removed in the operation of August 23, 1957. Although the court was not favorably impressed with libellant's accuracy or entire candor in testifying, or in his answers in the discovery procedure in this case, in the absence of affirmative evidence of any incident between the fall and the operation, it must accept libellant's testimony as to the absence of such incident. The fall having occurred in the course of libellant's duty while in the service of the ship, and his subsequent loss of time and hospitalization being causally connected with such fall, he is entitled to maintenance and cure until maximum recovery, unless he was guilty in his pre-sign-on physical examination of material concealment or failure to disclose facts which, in his opinion, might affect his acceptance or rejection for service.

Libellant testified that at the physical examination he was stripped to the waist, required to do bending and twisting exercises; that the scar of his previous operation was noted by the examining physician; that libellant disclosed the operation in 1950 (as appears from the examination slip) and that he answered truthfully all questions asked. He explained his negative answer to the question of back injury on the ground that he had none of permanence except that which occasioned the 1950 operation; and specifically, that the Fairland incident did not involve his back—a not unreasonable conclusion in view of the hospital records.

The examining physician was not produced in court by respondent.

 The court is unable to say that libellant was guilty of material concealment, or of failure to disclose facts which, *in his opinion,* might affect his acceptance or rejection for service. See Ahmed v. United States, 2 Cir., 1949, 177 F.2d 898, 900; Lorensen v. Jenney Manufacturing Co., D.C.D.Mass.1957, 155 F.Supp. 213, 214, 1957 A.M.C. 2097.

### Conclusions of Law.

1. This court has jurisdiction of the parties and subject-matter of the suit.

2. Libellant is not entitled to recover from respondent on the ground of unseaworthiness of the Amoco Virginia.

3. Libellant is not entitled to recover from respondent for any alleged negligence of respondent with respect to furnishing, or failing to furnish, libellant competent medical and hospital service and attention.

4. Libellant is entitled to recover from respondent maintenance and cure at the rate of $8 per day[8] from January 14, 1957 to January 28, 1958, or 379 days less the period from August 13,

---

7. Moreover, it would appear that any amount falling within the coverage of the second count would, if properly recoverable under recognized principles, be either a duplication of the recovery for unseaworthiness; or incorporated in the claim for maintenance and cure insofar as such alleged negligence postponed the date of maximum recovery.

8. The rate agreed upon by counsel.

1957 through September 5, 1957, or 24 days spent in Sinai Hospital, or a net of 355 days or $2,840; $674.30 for expenses in Sinai Hospital, August 13–September 5, 1957; $50 for back brace; $20 for physical therapy treatments; and $350 for medical services of Dr. Harrison, or a total of $3,934.30, for which let judgment be entered.